Filed 12/26/14  In re J.L. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.L. et al., Persons Coming Under the Juvenile Court Law. | B255625 (Los Angeles County Super. Ct. No. CK78026) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. I.L., Defendant, A.P., Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip Soto, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for the Appellant Minors.

A.P., in pro. per., for Objector and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

In the prior appeal, we affirmed an order terminating mother's parental rights over her daughter J.L. In the current appeal, J.L. and her sister A.L. as well as J.L.'s paternal grandmother seek review of the denial of paternal grandmother's Welfare and Institutions Code section 388[1] petition seeking custody of the two girls.

## FACTS AND PROCEDURE[2]

I.L. (mother) has four children, all of whom are in the dependency system. In a petition filed December 8, 2010, the Los Angeles County Department of Children and Family Services (DCFS) alleged mother and her male companion had a history of engaging in violent altercations in front of then seven-month-old J.L. The petition was sustained, and mother received 18 months of reunification services. In March 2011, DCFS reported that J.L. was placed in foster care, and her brother C.P. was placed with paternal grandmother. C.P. was freed for adoption by his paternal grandmother.

On June 5, 2012, DCFS recommended paternal grandmother adopt J.L.[3] DCFS reported that paternal grandmother wanted to adopt J.L. An assessment needed to be completed before J.L. could be placed in paternal grandmother's home. Paternal grandmother's homestudy was approved in November 2012. In December 2012, DCFS reported that J.L. and C.P. visited each other and appeared to enjoy each other's company.

---

[1]     Undesignated statutory citations are to the Welfare and Institutions Code.

[2]     We borrow heavily from the facts and procedure in the prior appeal—*In re J.L.* (June 18, 2014, B252557) (nonpub. opn.).

[3]     Paternal grandmother was C.P. and J.L.'s biological grandmother. She was not A.L.'s grandmother. Paternal grandmother was not appointed counsel in this appeal. She filed a notice of joinder.

2

J.L. was eventually returned to mother's care. However, J.L. was subsequently detained in April 2013 after her younger sister A.L. was hospitalized for dehydration. A.L.'s father is someone other than C.P. and J.L.'s father.

On April 15, 2013, DCFS filed a supplemental petition alleging that mother's medical neglect of A.L. placed J.L. at risk of harm. J.L. was placed with paternal grandmother.

On April 10, 2013, the social worker spoke with paternal grandmother and paternal grandmother said it was too overwhelming to care for both C.P. and J.L. DCFS placed the children with their foster father on April 16, 2013.

Mother did not appear at the jurisdictional hearing, and the supplemental petition was sustained. Mother was not given reunification services. Mother told a social worker that she would like J.L. and A.L. in DCFS's custody for their safety because she did not have a place to live. At the jurisdictional hearing, the court ordered DCFS to consider placing the children with any relatives or nonrelative extended family members.

On June 4, 2013, DCFS reported J.L. and A.L. were placed with their foster father G.S. J.L. was three years old, and A.L. was five months old at the time. DCFS further reported that paternal grandmother wanted to adopt J.L. but could not commit to adopting both J.L. and A.L. Paternal grandmother could not care for J.L. at that time because she was in the process of moving.

On June 4, 2013, the court ordered J.L. to be placed with paternal grandmother because J.L. had an existing relationship with C.P. C.P. was living with paternal grandmother in a pre-adoptive home. Paternal grandmother wavered on whether she wanted to take care of J.L., initially stating that she did not and later stating that she did but only after she moved residences. At paternal grandmother's request, J.L. was not immediately placed in her home and instead remained in her foster home, where she thrived. J.L. and C.P. visited each other weekly and enjoyed playing together.

Following the foster father's section 388 petition filed September 6, 2013, the court ordered J.L. and her younger sister to remain in the care of the foster father, reversing the order that J.L. be placed with paternal grandmother. In the petition, the

foster father explained that J.L. was enrolled in school and made progress academically, socially, and emotionally. When J.L. arrived at his home, she was operating at an 18-month level despite her chronological age of 35 months. But during her stay with her foster father she progressed to performing tasks at age level. J.L. and her younger sister were bonded to each other and to their foster father. Foster father indicated he cared for J.L. and her younger sister for over five months and that he had an approved adoption home study and was "ready and willing and able to love and parent these two little girls and would like to adopt them if possible." Foster father also indicated a willingness to "nurture a relationship with their brother [C.P.] . . . ." J.L.'s teacher emphasized J.L.'s strong bond with her foster father.

In a report dated September 24, 2013, paternal grandmother indicated she was interested in adopting both J.L. and A.L. but was not ready to have them placed with her because she was in the process of moving. Paternal grandmother also wanted to wait until there was childcare available where she did not need to pay for childcare. A social worker submitted the form for an assessment of paternal grandmother's home. C.P. enjoyed seeing his sisters in their weekly visits. At the September 24 hearing, paternal grandmother indicated she was willing to take both J.L. and A.L. into her home and had prepared her home for them. DCFS indicated that both paternal grandmother and foster father provided good homes for the children. C.P. was well cared for by paternal grandmother, but both J.L. and A.L. were "very bonded to the foster father and they have been improving a lot." Foster father stated that J.L. and A.L. were bonded to him and were thriving.

On September 24, 2013, the juvenile court ordered mother's parental rights be terminated. J.L. and her younger sister remained in the care of their foster father. The court explained its decision to leave the children in foster father's care: "[T]his is not quite a Solomon-type decision. I suppose on the one hand, we can say that [J.L.] and [A.L.] are very fortunate to have a foster father who is taking such good care of them and wants to adopt them and they're having stability where they are. [¶] On the other hand, they have a paternal grandmother who would like to be their caretaker." The court

4

concluded J.L. and A.L. should remain with their foster father. It reasoned that, at this stage in the proceedings, there was no longer a preference to place the girls with a relative, there was no reason to remove the children from their foster father, there were delays in placing the children with paternal grandmother, and J.L. has special needs and made enormous progress in the care of her foster father. A.L. lived almost her entire life with her foster father and was well cared for by him. Evidence that paternal grandmother now has an appropriate home "does not support [the conclusion] that it is in the children's best interest to be" placed with paternal grandmother.

The court referred the matter to the Alliance for Children's Rights or Public Counsel to assist in finalizing the adoption of J.L. and A.L. by their foster father.

On October 4, 2013, J.L. and A.L. sought rehearing of the court's decision on September 24, 2013, to refrain from ordering the children placed with paternal grandmother. The children had requested rehearing from the juvenile court's hearing terminating mother's parental rights. They argued that the denial of the request to place J.L. and A.L. with paternal grandmother conflicted with the court's June 4, 2013 order. J.L. and A.L. argued that the preferential consideration to relative was not provided in this case.

On October 15, 2013, paternal grandmother filed a section 388 petition. Paternal grandmother requested custody of J.L. and A.L. She indicated she had moved and was able to care for the children. The court noted that the issue had been considered and a rehearing was pending. On November 12, 2013, the court denied the section 388 petition.

On March 10, 2014, J.L. and A.L. again moved to be placed with paternal grandmother. They argued that the delay in grandmother moving was due to financial reasons and the delay in having her apartment approved was not grandmother's fault. Grandmother filed a declaration stating that she intended to have J.L. placed with her before J.L. returned to mother's custody. The motion noted that in April 2013, J.L. had been placed in paternal grandmother's home but removed because grandmother could not

afford daycare. Grandmother lost her job because of the days she took time off work to appear in court.

On June 8, 2013, DCFS planned to place J.L. and A.L. with paternal grandmother but she asked if they could remain with the foster parent while she looked for a new apartment. Paternal grandmother understood that J.L. and A.L. would be placed in her care when she found a new apartment. She informed the social worker she would have a new apartment by September 15, 2013. Grandmother obtained the apartment, which has a bedroom for J.L. and A.L.

According to grandmother, C.P. and J.L. enjoy their visits together. They play together and hold hands. The foster father allows these visits to take place only once a month. Grandmother stated, "I trusted the social worker's promise that I could wait a few months to save up money to get a bigger apartment for the comfort of the children. I was promised that they would be with me once the apartment was approved."

The court denied J.L. and A.L.'s request for placement with paternal grandmother. At a hearing March 25, 2014, the court explained: "I understand the desperation here. The grandmother feels, I feel it for her too, okay, and I am sorry it worked out that way; and I am not exactly happy with the department in doing what they did, but that doesn't change the situation with regards to the children in the home of the foster parent." While the court faulted DCFS for failing to give paternal grandmother more support, it concluded "[t]he bonding is with that caregiver not with the grandmother, not with the brother . . . . Really it is a focus on the children not on the brother not on the grandmother." The court found no evidence of "such a strong sibling bond that the children's welfare would be substantially disturbed if they were freed from their parents and put up for adoption by this caregiver who . . . is providing for them, has provided for them, is going out of his way to make sure that they get every advantage in life . . . ." The court denied grandmother's section 388 petition and found no exception to adoption. The court stated it "finds there is no changed circumstances and that it is not in the best interests of the children to be returned to grandmother . . . and they will not be returned or

6

placed there." The court's minute order dated March 25, 2014, found no change in circumstance.

J.L. and A.L. filed a notice of appeal April 8, 2014.

## DISCUSSION

### 1. The Appeal Is Timely

Respondent argues that the court did not have authority to reconsider grandmother's section 388 petition, and therefore the appeal from the denial of the purported motion for reconsideration is not timely. DCFS did not argue in the juvenile court that the court lacked authority to reconsider a 388 petition.

The circumstances of this case suggest the hearing was on the merits of paternal grandmother's section 388 petition, not on a motion for reconsideration. Initially, the juvenile court conditionally denied the section 388 motion because it planned to consider the same issue. The juvenile court did not conclude the petition was indisputably without merit, and it suggested that it viewed the placement of J.L. and A.L. as a difficult issue. More significantly, the court treated the March 2014 hearing as a hearing on grandmother's section 388 petition indicating that it was denying the petition because it found no changed circumstances. Therefore, under the peculiar circumstances of this case, we broadly construe the March 25, 2014 order as a denial of the section 388 petition (not a denial of the motion for reconsideration).

### 2. A.L. and J.L. Fail to Demonstrate Error in the Denial of Paternal Grandmother's Section 388 Petition

To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.] 'The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.'" (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Arguably paternal grandmother presented new evidence as she demonstrated that she had obtained adequate housing for J.L. and A.L. The children had not previously been placed with her because she wanted to wait until she moved into new housing.

7

However, paternal grandmother failed to show that the proposed change would promote the best interest of J.L. or A.L. Evidence that C.P. and J.L. enjoyed playing together and missed each other did not show it was in J.L.'s interest to separate her from her foster father to whom she had a strong attachment. The court emphasized that J.L. had special needs and was thriving in the care of her foster father. The record overwhelmingly shows that paternal grandmother loves J.L. and A.L., but it also shows that J.L. and A.L. love their foster father and are bonded to him. The court did not abuse its discretion in concluding that it was in J.L. and A.L.'s best interest to keep them in the care of their foster father.

There was no violation of the statutory preference for placement of a child with a relative.[4] DCFS investigated paternal grandmother as it was required to do by court

---

[4] Section 361.3 provides in part:

"(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status. In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors:

"(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.

"(2) The wishes of the parent, the relative, and child, if appropriate.

"(3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.

"(4) Placement of siblings and half siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002.

"(5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.

"(6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.

"(7) The ability of the relative to do the following:

8

order, but paternal grandmother initially declined DCFS's request that she care for J.L. Although the juvenile court faulted DCFS, the record indicated that DCFS actually took steps to place J.L. and A.L. with paternal grandmother. The children would have been placed with paternal grandmother, but she declined the placement because she was not prepared for them. On April 10, 2013, the social worker spoke with paternal grandmother and paternal grandmother said it was too overwhelming to care for both C.P. and J.L. Paternal grandmother was willing to care for J.L. only for a few days because it was too overwhelming for her to care for both J.L. and C.P. For that reason DCFS placed the children with their foster father. The record does not support the contention that DCFS ignored the statutory preference for a relative placement or the juvenile court's June 4 order that the children be placed with paternal grandmother. They were instead placed with their foster father because paternal grandmother was unable to care for them at that time.

---

"(A) Provide a safe, secure, and stable environment for the child.

"(B) Exercise proper and effective care and control of the child.

"(C) Provide a home and the necessities of life for the child.

"(D) Protect the child from his or her parents.

"(E) Facilitate court-ordered reunification efforts with the parents.

"(F) Facilitate visitation with the child's other relatives.

"(G) Facilitate implementation of all elements of the case plan.

"(H) Provide legal permanence for the child if reunification fails.

"However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.

"(I) Arrange for appropriate and safe child care, as necessary.

"(8) The safety of the relative's home. For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309.

". . . The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them."

9

**DISPOSITION**

The court's order denying paternal grandmother's section 388 petition and ordering J.L. and A.L. to remain in their foster father's custody is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.